## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1.  MEGAN COFFMAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. CIV-22-426-D |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | ATTORNEY LIEN CLAIMED |
| 1. FIRST PHYSICIANS SERVICES, LLC, | ) | |
| | ) | |
| 2. FIRST PHYSICIANS CAPITAL GROUP, | ) | |
| | ) | |
| 3. FIRST PHYSICIANS BUSINESS | ) | |
| SOLUTIONS, LLC d/b/a First Physicians | ) | |
| Capital Group, | ) | |
| | ) | |
| 4. AVEM BUSINESS SOLUTIONS, LLC | ) | |
| d/b/a First Physicians Capital Group, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| 5. RHA STROUD, INC. d/b/a Stroud | ) | |
| Regional Medical Center, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

**COMES NOW THE PLAINTIFF,** Megan Coffman, and hereby pleads her claims as follows:

## PARTIES

1.      The Plaintiff is Megan Coffman, an adult resident of Seminole County, Oklahoma.

2.      The Defendants are:

      A.      First Physicians Services, LLC;

      B.      First Physicians Capital Group;

C.      First Physicians Business Solutions, LLC d/b/a First Physicians Capital Group;

D.      Avem Business Solutions, LLC d/b/a First Physicians Capital Group; and

E.      RHA Stroud, Inc., d/b/a Stroud Regional Medical Center.

All named Defendants are domestic for-profit entities doing business in Lincoln County, Oklahoma.

## **VENUE**

3.      Plaintiff's claims are for gender discrimination (including in the creation of a hostile working environment) and retaliation for having complained of both gender discrimination and race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and Oklahoma's Anti-Discrimination Act ("OADA"). Jurisdiction over the federal claims is vested pursuant to 28 U.S.C. § 1331 and jurisdiction over the state claims is vested pursuant to 28 U.S.C. § 1367.

4.      The majority of the conduct giving rise to this action occurred in Lincoln County, Oklahoma, which is the Western District of Oklahoma and Defendants may be served in that county, wherefore venue is proper in this Court under 28 U.S.C. § 1391(b).

## **STATEMENT OF FACTS**

5.      Defendants, jointly and/or separately, employed at least fifteen employees for each of twenty (20) or more calendar weeks in the current or proceeding year and are employers under Title VII. There is no minimum employee requirement to be subject to the provisions of the OADA.

6.      Each respective Defendant was Plaintiff's employer in that they functioned as a joint employer and/or integrated enterprise in the following manner:

A.      Defendant First Physicians Services, LLC ("Defendant FPS") held itself out as Plaintiff's employer on Plaintiff's paystubs and IRS Forms W-2;

B.      Defendant First Physicians Capital Group ("Defendant FPCP") held itself out as Plaintiff's employer on Plaintiff's employment documents, including her Employee Handbook;

C.      Defendant First Physicians Business Solutions, LLC d/b/a First Physicians Capital Group ("Defendant FPBS") held itself out as Plaintiff's employer in that Defendants' Human Resources Director, Regan Lala, who had supervisory authority over the Plaintiff and controlled and dictated the terms of Plaintiff's employment held herself out to be an employee of Defendant FPBS, including in correspondences regarding Plaintiff's termination;

D.      Defendant Avem Business Solutions, LLC d/b/a First Physicians Capital Group ("Defendant ABS") was Plaintiff's employer in that Defendants have held out that Defendant ABS may be the actual legal name of Defendant FPCG; and

E.      Defendant RHA Stroud, Inc., d/b/a Stroud Regional Medical Center ("Defendant Stroud") was Plaintiff's employer in that Plaintiff's employment was suspended by Ed Dyer, Chief Executive Officer of Defendant Stroud, and Plaintiff's direct supervisor at the time, Jerod Waters,

held himself out as Chief Nursing Officer of Stroud Regional Medical Center.

Each respective Defendant jointly and/or as an integrated enterprise controlled the terms of the Plaintiff's employment during all relevant times.

7.  Defendants employed at least fifteen employees for each of twenty (20) or more calendar weeks in the current or proceeding calendar year and are employers under Title VII. There is no minimum employee requirement to proceed under the OADA.

8.  Plaintiff was an employee of the Defendants from on or about June 29, 2012, until her involuntary termination on or about July 9, 2021.

9.  At the time of her termination, Plaintiff held the position of Laboratory Supervisor.

10. During all relevant times, Plaintiff was qualified for her position and performed satisfactorily.

11. On or around mid- to late December 2020, a subordinate of Plaintiff's named Harold Sims approached Plaintiff in the workplace and engaged in unwelcomed sexually harassing conduct towards the Plaintiff including walking up to the Plaintiff, running his fingers through her hair, and telling the Plaintiff that he thought she looked "sexy".

12. On or around December 28, 2020, Plaintiff reported Mr. Sims' sexually harassing conduct as described in Para. 11, above, to her immediate supervisor, Jerod Waters (Chief Nursing Officer).

13. Mr. Waters responded to Plaintiff's report regarding Mr. Sims, as described in Para. 12, above, by informing Plaintiff that he (Mr. Waters) would relay her report of

sexual harassment against Mr. Sims to Defendants' Director of Human Resources, Regan Lala.

14.     In the days immediately following Plaintiff's report to Mr. Waters, as described in Para. 13, above, another one of Plaintiff's subordinates, Sadie Bear, reported to Plaintiff that she did not feel comfortable being around Mr. Sims and cited to specific examples of Mr. Sims' sexually harassing conduct which included Mr. Sims commenting on Ms. Bear's breasts and claiming to others in the workplace that he (Mr. Sims) was the father of Ms. Bear's child (Ms. Bear was pregnant at this time).

15.     On or around this same time (approximately last December 2020), Mr. Waters notified Plaintiff that she (Plaintiff) could expect a phone call from Ms. Lala, which Plaintiff understood to be a result of Mr. Waters notifying Ms. Lala of her complaint regarding Mr. Sims' sexually harassing conduct, as described in Paras.11-13, above.

16.     Later that day, Ms. Lala called Plaintiff, but instead of discussing Plaintiff's report of sexual harassment against Mr. Sims, Ms. Lala stated that the reason for their call was that Mr. Sims had actually recently made a complaint against Plaintiff. Specifically, Ms. Lala claimed that Mr. Sims had reported Plaintiff for:

    A.     Requiring Mr. Sims to follow company protocols and procedures in a manner that she was not applying to others under her supervision; and

    B.     Allowing food to be kept in the laboratory area (which was not permitted).

17.     Ms. Lala claimed Mr. Sims had substantiated his claims against Plaintiff by sending photos of a crockpot in the laboratory area to Ms. Lala.

18.   Plaintiff explained to Ms. Lala that the allegations by Mr. Sims against Plaintiff were false, including notably, that the crockpot in question belonged to Mr. Sims and that Mr. Sims had brought the crockpot to work and placed it in the breakroom (which was permitted) on Christmas Day (while Plaintiff was not on shift).

19.   During this same phone call between Plaintiff and Ms. Lala, Plaintiff reported to Ms. Lala the same complaint of sexual harassment she had made to Mr. Waters regarding Mr. Sims, as described in Paras.11-13, above, and further notified Ms. Lala that Ms. Bear had just recently made a similar complaint of sexual harassment against Mr. Sims, as described in Para. 14, above.

20.   Ms. Lala responded to Plaintiff's reports of sexual harassment against Mr. Sims, as described in Para. 19, above, by stating that she would speak with Ms. Bear to confirm these allegations and then promptly ended the phone call.

21.   On or around early January 2021, Plaintiff was working with Ms. Bear in the laboratory when Ms. Bear received a phone call from Ms. Lala and placed her phone on speaker such that Plaintiff could listen to the conversation.

22.   During this conversation between Ms. Lala and Ms. Bear, Ms. Lala asked Ms. Bear whether she had been subjected to the sexually harassing conduct that had been reported to her by Plaintiff.

23.   Ms. Bear confirmed to Ms. Lala that Mr. Sims had made sexually harassing comments regarding her breasts and claimed to other coworkers that he (Mr. Sims) was the father of Ms. Bear's unborn child.

24. Ms. Lala responded to Ms. Bear's report of sexual harassment against Mr. Sims by stating that she would investigate her allegations against Mr. Sims and that if Ms. Bear had any additional information to provide, she could contact Kendra McWilliams (a member of Ms. Lala's department).

25. Immediately after getting off the phone with Ms. Lala, Ms. Bear informed Plaintiff that she (Ms. Bear) did not want to be placed on the same schedule as Mr. Sims anymore because she was fearful that Ms. Lala would notify Mr. Sims that she (Ms. Bear) had complained against Mr. Sims.

26. After Ms. Bear told Plaintiff that she did not feel safe being on the same shift as Mr. Sims anymore, Plaintiff responded by simply not placing Mr. Sims on the schedule anymore.  Plaintiff was permitted to take this action in that Mr. Sims was considered "PRN" or "as needed", meaning, he was not considered a full-time, or even part-time, employee and was not entitled to a specific number of hours.

27. Over the next several weeks, Plaintiff did not hear anything further from Human Resources regarding any of the complaints made against Mr. Sims or the complaint made by Mr. Sims against her (Plaintiff).

28. On or around February 8, 2021, Mr. Waters allowed Plaintiff to read an e-mail thread between himself (Mr. Waters), Ms. Lala, Michele Ward (Director of Operations for Defendant FPCG), and Karla Cason (Chief Clinical Officer for Defendant FPCG).  Through this e-mail thread, Plaintiff learned that Ms. Lala had been continuing to pursue the allegations made by Mr. Sims against Plaintiff (though not the claims made by Plaintiff or Ms. Bear against Mr. Sims).

29.     In this e-mail thread, as described in Para. 28, above, Ms. Lala stated that she was trying to arrange for Mr. Sims to be placed back on the schedule at Defendants' facility, however, Mr. Sims had supposedly communicated to Ms. Lala that he would not return unless and until Plaintiff had either been demoted or terminated.

30.     Ms. Cason responded to Ms. Lala in this e-mail thread by suggesting that Plaintiff should be written-up as a means of satisfying Mr. Sims.

31.     After having allowed Plaintiff to read this e-mail thread, Mr. Waters informed Plaintiff that the duty had fallen to him (Mr. Waters) to issue Plaintiff a write-up regarding Mr. Sims' allegations of food in the workplace.

32.     On or around February 11, 2021, Mr. Waters presented Plaintiff with the write-up and had her sign it, however, Mr. Waters communicated to Plaintiff at this time that he (Mr. Waters) did not agree with the decision to issue Plaintiff discipline.

33.     On or around mid- to late March 2021, Plaintiff was notified by Mr. Waters that Defendants' Human Resources department had made the decision that Mr. Sims was going to return to work at Defendants' facility and that Plaintiff would be required to place Mr. Sims back on the schedule within her laboratory.

34.     During this same conversation, Mr. Waters informed Plaintiff that Defendants' Human Resources department had made the decision that neither Mr. Waters nor Plaintiff would be permitted to issue discipline to Mr. Sims in any manner, but that instead, all matters regarding Mr. Sims would simply have to be reported to Defendants' Human Resources department.

35.   On or around late March 2021, Plaintiff received a report from a female employee named Cherokee Clark (Native American) that Mr. Sims had been making racially discriminatory jokes and comments about her, including sarcastically calling her "Quapaw" and "Arapaho" as if that were Ms. Clark's name.  Ms. Clark reported to Plaintiff that she felt Mr. Sims' comments were racially discriminatory and offensive.

36.   In response to Ms. Clark's complaints of race discrimination against Mr. Sims, as described in Para. 35, above, Plaintiff contacted Defendants' Human Resources department and reported Mr. Sims' racially discriminatory conduct as reported to her by Ms. Clark.

37.   Between March 2021 and June 2021, neither Plaintiff nor Ms. Clark (to the best of Plaintiff's knowledge) was contacted in any manner by Defendants' Human Resources department, or any other person alleging to be investing the complaint.

38.   On or around June 16, 2021, Ms. Clark came to Plaintiff to complain that Mr. Sims was continuing to engage in the same racially discriminatory conduct as described in Para. 35, above.

39.   In response to Ms. Clark's renewed complaint against Mr. Sims, Plaintiff again reported to Defendants' Human Resources department that Mr. Sims was engaging in racially discriminatory conduct towards Ms. Clark.

40.   Approximately two weeks thereafter, Plaintiff was contacted by Terisa Blair (a member of Defendants' Human Resources department) and reminded Plaintiff that she was under strict instructions from Ms. Lala to not discipline Mr. Sims for any

reason.   Ms. Blair did not inquire any further regarding the reports of race discrimination made against Mr. Sims.

41.   On or around July 8, 2021, while at work, Plaintiff was required to meet with Mr. Waters, Ed Dyer (CEO of RHA Stroud), Ms. Blair, and a third individual who supposedly worked for Defendants' Human Resources department.

42.   During this meeting, Mr. Dyer informed Plaintiff that the decision had been "collectively" made that Plaintiff would have to "step back" from her position as Laboratory Supervisor.

43.   Mr. Dyer stated that the reason for the decision to require Plaintiff to "step back" was Plaintiff's "professionalism" and told Plaintiff that she was being "offered" a demotion into a non-management, night shift position (Plaintiff had only worked day shift prior to this) that included a downgrade in pay by approximately 25%.

44.   Before Plaintiff could respond, Mr. Dyer spoke to Plaintiff regarding a Clinical Laboratory Improvement Amendment ("CLIA") review/survey that had taken place at the hospital during the prior month.   Specifically, Mr. Dyer stated: "I want to acknowledge fully that, you know, leading up to this survey, when you factor out the medical directorship, which you had no responsibility for – honestly Jerod and I have talked.   I think we had a really good survey otherwise. So I wanted to acknowledge, you know, the work that you've done leading up to that because you had a lot to do with that."

45.   At this time, Mr. Dyer inquired as to whether Plaintiff had any "thoughts" about the involuntary demotion Defendants' had just "offered" Plaintiff.   Plaintiff responded

by stating that she believed that this was about "the Harold [Sims] thing" and reaffirmed her prior complaints regarding Mr. Sims' sexually harassing and racially discriminatory conduct, and further complained that Mr. Sims had been allowed to return and was made "untouchable" in that she (Plaintiff) was not allowed to issue any discipline to Mr. Sims for his behavior.

46.    Mr. Dyer responded to Plaintiff's complaints by stating: "I'm not going to acknowledge anything about that situation."

47.    Plaintiff further complained about Mr. Sims at this time by stating: "You can't expect people in the lab to want to listen if Harold [Sims] can get away with that stuff. Of course, it's going to cause a hostile working environment. Not only does it cause hostility in the lab, but it leaks into the registration because now he's calling them names." (Cherokee Clark worked in registration).

48.    Plaintiff implored Mr. Dyer to identify examples of her alleged lack of professionalism, to which Mr. Dyer strictly cited Mr. Sims' complaint from December 2020 (over six months prior) that Plaintiff had allowed eating in the laboratory.

49.    At this time, Plaintiff questioned Mr. Dyer as to what would occur if she did not "accept" this "offer" to a non-management, night shift position that included a substantial decrease in pay, to which Mr. Dyer responded that if she "chose" to not "accept" the "offer", the Defendants would interpret that as a voluntary resignation on the part of Plaintiff.

50.    Plaintiff informed Mr. Dyer that she intended to neither voluntarily accept this demotion nor voluntarily resign her position, to which Mr. Dyer informed Plaintiff that she was to be suspended pending further review, at which time the meeting came to a close.

51.    On or around July 9, 2021, Plaintiff received a letter from Ms. Lala setting out that Plaintiff was being terminated with the stated reason being that Plaintiff had "decided not to accept" the position "offered" to her during this meeting.

52.    As a direct result of the Defendants' conduct, Plaintiff has suffered, and continues to suffer wage loss (including back, present, and front pay along with the value of benefits associated with such wages) as well as emotional distressed/dignitary harm including worry, frustration, sadness and similar unpleasant emotions.

53.    At the least, significant factors in the decision to terminate Plaintiff include her gender and her reports of discrimination (including on the basis of gender and race).

54.    Plaintiff has exhausted her administrative remedies against Defendants FPS, FPCG, FPBS and ABS by timely filing Charges of Discrimination against each on or about August 11, 2021, and November 30, 2021. The EEOC combined these Charges under a single Charge Number and issued Plaintiff's right to sue letter on March 31, 2022, and the Plaintiff received the same thereafter.  This complaint is timely filed within ninety (90) days of Plaintiff receiving her right to sue letter.  Plaintiff additionally filed a timely Charge of Discrimination against Defendant Stroud on or about November 11, 2021.  Upon receipt of her right to sue letter pertaining to her

Charge against Defendant Stroud, Plaintiff will move to amend this Complaint to reflect the same.

## COUNT I

Plaintiff incorporates the above paragraphs and further alleges:

55.   Gender discrimination (including in the form of sexual harassment and the creation of a hostile working environment) and retaliation for complaining of gender discrimination (including in the form of sexual harassment and the creation of a hostile working environment) violates Title VII of the Civil Rights Act of 1964.

56.   Under this Count, Plaintiff is entitled to her wage loss (including back, present, and front pay along with the value of benefits associated with such wages) and emotional distress damages.

57.   Because Defendant's conduct was willful or, at the least, in reckless disregard of Plaintiff's rights, she is entitled to an award of punitive damages.

58.   Plaintiff is entitled to an award of attorney's fees and cost.

## COUNT II

Plaintiff incorporates the above paragraphs and further alleges:

59.   Gender discrimination (including in the form of sexual harassment and the creation of a hostile working environment) and retaliation for complaining of gender discrimination (including in the form of sexual harassment and the creation of a hostile working environment) violates Oklahoma's Anti-Discrimination Act (OADA).

60. Under this Count, Plaintiff is entitled to her wage loss and benefit loss and liquidated damages.

61. Plaintiff is entitled to an award of attorney's fees and cost.

## **COUNT III**

Plaintiff incorporates the above paragraphs and further alleges:

62. Retaliation for complaining of race discrimination violates Title VII of the Civil Rights Act of 1964.

63. Under this Count, Plaintiff is entitled to her wage loss (including back, present, and front pay along with the value of benefits associated with such wages) and emotional distress/dignitary harm damages.

64. Because Defendant's conduct was willful or, at the least, in reckless disregard of Plaintiff's rights, she is entitled to an award of punitive damages.

65. Plaintiff is entitled to an award of attorney's fees and costs.

## **COUNT IV**

Plaintiff incorporates the above paragraphs and further alleges:

66. Retaliation for complaining of race discrimination violates Oklahoma's Anti-Discrimination Act (OADA).

67. Under this Count, Plaintiff is entitled to her wage loss and benefit loss and liquidated damages.

68. Plaintiff is entitled to an award of attorney's fees and cost.

## **PRAYER**

**WHEREFORE**, Plaintiff requests this Court enter judgment in her favor and against the Defendant and grant her all compensatory damages suffered, together with all damages, attorneys' fees, costs and interest and such other legal and equitable relief as this Court deems just and proper.

### **RESPECTFULLY SUBMITTED THIS 24th DAY OF MAY 2022.**

s/ Amber L. Hurst
Hammons, Hurst & Associates
Mark Hammons, OBA No. 3784
Amber L. Hurst, OBA No. 21231
Brandon D. Roberts, OBA No. 34012
325 Dean A. McGee Ave.
Oklahoma City, OK, 73102
Telephone: (405) 235-6100
Facsimile: (405) 235-6111
Email: amber@hammonslaw.com
Jury trial demanded
Attorney Lien claimed
